Filed 6/9/22  P. v. Galafate CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ROMAN GALAFATE III,<br><br>Defendant and Appellant. | F081564<br><br>(Kern Super. Ct. No. SC036346A)<br><br><br>**OPINION** |

### THE COURT\*

APPEAL from a judgment of the Superior Court of Kern County.  Michael G. Bush, Judge.

Jean M. Marinovich, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

---

\* Before Hill, P. J., Levy, J. and Poochigian, J.

**INTRODUCTION**

In 1989, appellant Roman Galafate III (Roman) and his then-wife, codefendnat Leny Petersen Galafate (Leny),[1] were convicted after a joint jury trial of count 1, first degree premeditated murder, with the special circumstance that the murder was intentional and carried out for financial gain; and count 2, conspiracy to commit murder for financial gain. They were both sentenced to life in prison without the possibility of parole for count 1, with a stayed term of 25 years to life for count 2. In 1991, this court affirmed defendants' convictions and sentences on direct appeal.

The instant appeal involves Roman's petition for resentencing filed pursuant to Penal Code[2] section 1170.95 in 2019, that alleged he was entitled to relief because he was not the actual killer, and his murder conviction was based on the felony-murder rule and/or the natural and probable consequences doctrine. The superior court appointed counsel and the parties submitted briefing. The court summarily denied the petition without holding a hearing.

On appeal, Roman's appellate counsel has filed a brief which summarizes the facts with citations to the record, raises no issues, and asks this court to independently review the record. (*People v. Wende* (1979) 25 Cal.3d 436.) We affirm.

**FACTS[3]**

In the mid-1980's, defendants Roman Galafate (Roman) and his then-wife, Leny Petersen Galafate (Leny), resided with family members in Delano, California. Roman

---

[1] Given their identical last names, we will refer to appellant as "Roman" and his codefenant as "Leny."

[2] All further statutory citations are to the Penal Code unless otherwise indicated.

[3] The People filed an opposition to Roman's section 1170.95 petition that contained a detailed factual statement that appears consistent with either the probation report prepared for Roman's 1989 sentencing hearing, or the factual statement from this court's opinion that affirmed defendants' convictions in 1991. In the instant appeal, Roman has repeated this same factual statement in his opening brief.

2.

was an agent for Midland National Life Insurance Company (Midland National) and had an office in the MGM Professional Building at 1201 Jefferson Street in Delano. On September 9, 1985, defendants filed a voluntary petition in the United States Bankruptcy Court for the Eastern District of California. The court discharged their debts pursuant to chapter 7 of the Federal Bankruptcy Code on February 5, 1986.

Defendants maintained close ties with members of their extended family, including Reny and Violeta Petersen. Reny Petersen was Leny's uncle, her father's brother. Leny regularly visited her aunt by marriage, Violeta Petersen, and was godmother of Reny and Violeta's minor son, Chris. Roman wrote insurance policies for various family members, including a $75,000 life insurance policy on Violeta Petersen in October 1985. That policy named her husband, Reny Petersen, as the beneficiary of the proceeds.

---

Leny filed a separate petition for resentencing under section 1170.95, and it was also denied. In Leny's appeal from the denial of her section 1170.95 petition, this court granted her motions to augment the appellate record to include the surviving records from defendants' joint jury trial in 1989, including the pleadings, minute orders, printed jury instructions, and verdict forms; and this court's 1991 opinion that affirmed their convictions on direct appeal. In response to Leny's augmentation motion, the Court Supervisor for the Superior Court of Kern County filed a declaration that the reporter's transcripts for defendants' 1989 jury trial were no longer available.

Given that Roman and Leny were tried and convicted together, and their convictions affirmed in a joint direct appeal, this court advised the parties in Roman's instant appeal that it was taking judicial notice of the appellate record in Leny's appeal from the denial of her section 1170.95 petition, to the extent those records contained documents from defendants' joint jury trial. Neither Roman nor the People objected.

The following factual summary is thus based on the facts stated in this court's 1991 nonpublished opinion that affirmed defendants' convictions on direct appeal (*People v. Galafate,* et al. (Apr. 8, 1991, F012067)), augmented to Leny's appellate record, and which we have taken judicial notice in this appeal without objection from the parties. (§ 1170.95, subd. (d)(3); Evid. Code, § 450, § 452, subd. (d), § 459; *In re W.R.* (2018) 22 Cal.App.5th 284, 286–287, fn. 2.) As will be explained below, we provide these facts for background purposes but do not rely on these facts in resolving the issues presented in this appeal. (See § 1170.95, subd. (d)(3).)

Approximately two weeks after the defendants received their discharge in bankruptcy, Roman processed an application for a $250,000 insurance policy on the life of Violeta Petersen. The application was dated February 18, 1986, and named "Leny Petersen" as beneficiary of the proceeds. "Leny Petersen" was Leny's maiden name. Leny signed her aunt's name on the policy application. Although Violeta's address was 20857 Francis Drive in Richgrove (Tulare County), the application bore Roman's post office box number in Delano.

Sometime prior to Sunday, February 23, 1986, Roman purchased an $83 money order from the Miracle Market at 1643 Cecil Avenue in Delano. Store manager Pete Medrano required customers to pay cash for money orders but did not require presentation of identification. According to Medrano, the store personnel generally filled in the amount of the money order and the customer completed the rest of the information. Although Roman admitted purchasing the $83 money order, the face of the instrument indicated Violeta Petersen purchased it on February 18, 1986.

Roman transmitted the completed application and money order to Midland National in Sioux Falls, South Dakota. Midland National received the documents sometime between 6:15 a.m. on Friday, February 21, 1986, and 6:15 a.m. on Monday, February 24, 1986.[4]

**Discovery of Mrs. Petersen's Body**

Reny Petersen last saw his 34-year-old wife, Violeta, at their Richgrove home on Saturday morning, February 22, 1986. Violeta had received her paycheck the day before and was carrying $500 in cash. She planned to pay bills that day.

---

[4] The Sioux Falls office was not open on Saturday, February 22, 1986, or Sunday, February 23, 1986. The parties stipulated there was mail pickup at 6:15 a.m. on Friday, February 21, and the next pickup was at 6:15 a.m. on Monday, February 24. The insurance application was collected during the latter pickup. United States Postal Service supervisor, Martoria Sherman, testified that it would take a minimum of two days, and probably three, for a letter mailed in Delano to reach Sioux Falls.

At 6:50 p.m. that day, Martha Salinas was traveling northbound on Browning Road from McFarland to Delano. At the intersection of Browning and Pond Roads, Salinas saw a large car speeding westbound on Pond Road. The car went through a stop sign, swayed, and almost crashed into Salinas's car. Salinas saw the male driver pull the car over and park. A few minutes after 7:00 p.m., Salinas returned by the same route and saw a body in the roadway in the vicinity of where the car had been parked. The body had not been there earlier. Salinas stayed at the scene until law enforcement officers arrived.

Kern County sheriff's deputies were dispatched to the scene and found the body of a fully clothed female lying on her back. A blueish-colored tongue protruded from the victim's mouth. The victim's sweater was pulled up over her head and a distinctive bruise surrounded her neck. Officers found a purse, jewelry, and several bank books scattered about the victim as well as loose fibers on her face and body. A wallet contained a driver's license in the name of Violeta Bacena Petersen. The officers did not find any money in either the purse or the wallet.

That same evening, Reny Petersen stopped by his father's grave on his way home from work. Sometime after 6:00 p.m., Reny realized Violeta was gone. After unsuccessfully attempting to locate her, Reny filed a missing person report with Tulare County Sheriff's Detective Charles Denchfield around 10:30 p.m. Denchfield relayed the information to his communications unit, the Delano Police Department, and the Kern County Sheriff's Department.

Around midnight, Kern County sheriff's detectives advised Reny his wife was dead. Detective Sergeant Craig Fraley took carpet samples from Reny's home several days later.

**The Autopsy and Fiber Evidence**

On February 24, 1986, Dr. Armand L. Dollinger, a forensic pathologist, performed an autopsy on the five-foot three-inch, 102-pound body of Violeta Petersen. Dollinger

5.

concluded Violeta died by asphyxiation caused by ligature strangulation sometime prior to 2:00 p.m. on February 22, 1986. The ligature could have been a rope or cord. The particularly prominent mark of the neck wound demonstrated considerable force was used to hold the ligature. Dr. Dollinger testified that death by ligature strangulation would have taken several minutes. The right hyoid, a small bone in the throat, was fractured. Aside from the wounds to the neck, the victim had bruises on the back of the head, over the left eye, on the cheeks, and on the left wrist. The livor mortis (color from blood settling to the lower portion of the body), facial petechial hemorrhaging (breakage of small vessels), and flattening of the face showed the victim had been face down for at least two to six hours after death.

James A. Malouf, a Kern County coroner's investigator, concluded the victim must have been killed elsewhere, placed face down for a time, and later left face up on Browning Road. The victim's pants were wet, and her panty shield was soaked. However, there was no evidence of sexual assault. Dr. Dollinger said urination is a frequent occurrence during death by ligature strangulation.

During the autopsy, Kern County Criminalist Bernadetta Rickard collected trace evidence and took biological samples for analysis. She recovered fibers from the victim's neck wounds, body sheet, mouth, and hair. Rickard testified these fibers were collected before the body was disrobed. However, the fiber taken from the victim's mouth was recovered much later than the ones taken from the body sheet. Further, the envelope containing the mouth fiber did not specifically state it had been recovered before the disrobing of the victim. The recovered fibers were various colors, including green, red, black, and multicolored. There were several red fibers but no green fibers in the neck wounds. There were one or two green fibers, and various multicolored fibers in the mouth and on the tongue. Rickard found one green fiber on a lock of hair, another green fiber on another portion of the victim's hair, and at least two green fibers on the body sheet. Overall, the fibers were primarily green.

**Further Investigation**

On the date of the autopsy, Roman telephoned Midland National in Sioux Falls and reported Violeta Petersen had died on February 22. Roman requested instructions on completing a claim and also inquired whether Midland National had received the victim's most recent policy application. Roman told Midland National personnel the application had been filled out the preceding Tuesday or Wednesday. He reported there were two policies – one for $75,000 and one for $250,000. Roman said the victim had been so pleased with the first policy that she wanted a second policy. Donald Lemke, Midland National's Vice President of Claims, testified no policy was ever issued on the $250,000 application.

On February 26, 1986, Kern County sheriff's officers found Violeta's brown Honda Civic at the Sundance Inn, 405 Cecil Avenue, in Delano. The vehicle had been parked at the motel for a couple of days. The driver's seat had been adjusted to accommodate a driver taller than Violeta. The car was very clean and even the decedent's fingerprints could not be found on the vehicle. Law enforcement personnel unsuccessfully attempted to identify a print on the sun visor.

Sergeant Fraley took carpet samples from the motel. On March 18, 1986, Kern County Criminalist Gregory Laskowski conducted a fiber analysis on the material recovered from the victim's body. Laskowski concluded those fibers did not come from the carpet in the Petersen residence or the Sundance Inn.

**Defendants' Statements and Conduct**

On March 18, 1986, Roman telephoned Donald Lemke at the Midland National office in Sioux Falls and advised that "Leny Petersen" was his wife. Lemke questioned why the victim used the name of Petersen instead of Galafate in the beneficiary designation. Lemke noted Leny used the name Leny P. Galafate when she applied for status as an authorized agent with Midland National on October 22, 1985. Roman promised to send Lemke information on the usage of Leny's maiden name.

7.

On March 24, 1986, Lemke received a letter dated March 18, 1986, from Roman. However, the letter did not explain why the name "Leny Petersen" was used in the beneficiary designation. Lemke sent Roman a letter dated April 1, 1986, explaining what needed to be done to submit a claim regarding the $250,000 policy application. On April 7, 1986, Midland National received a $250,000 claim dated April 4, 1986, and signed "L. Petersen."

Earlier in March 1986, Midland National retained Donald Lake of Equifax Services to investigate the questionable claim. Lake obtained a statement from Leny Galafate on April 8, 1986. Leny said she learned of Violeta's death when her uncle, Reny, telephoned her late in the evening of February 22 or early morning of February 23. On April 14, 1986, Lake telephoned Kern County Sheriff's Detective Craig Fraley, the primary investigator assigned to the Violeta Petersen homicide case. Fraley immediately telephoned Donald Lemke in South Dakota and obtained several documents, including applications for insurance policies on Violeta's life.

On April 18, 1986, Donald Lake interviewed Roman in his Delano office and obtained a signed statement from him. Roman said Violeta took out a $75,000 insurance policy in October 1985 and designated her husband, Reny, as the beneficiary. Roman said Violeta decided to purchase a second, larger policy after making a number of visits to his office. Violeta also mentioned she was considering changing the beneficiary on the $75,000 policy. Violeta frequently visited her niece, Leny, at Roman's insurance office. During these Friday visits, Violeta often spoke with Roman about acquiring another policy.[5]

However, it was not until a week before her death that Violeta actually applied for the policy. Roman told Lake he and Violeta were alone when the policy application was completed. Violeta's son, Chris, was in another room of the office suite until the "tail

_____

[5] Reny Petersen stated his wife had not been interested in insurance at all because she believed it was like a curse.

8.

end" of the transaction. Roman was under the impression Violeta did not want Reny to know about the second policy. Roman said Violeta gave him cash to pay the premium because her checkbook was "kind of fouled up." Roman claimed he had taken the money to Presidio Savings and Loan in Delano on Saturday, February 15, 1986, but it was closed. He obtained a money order from the bank on Monday, February 17, 1986, and mailed the money order and application to Midland National on the same day.

On May 8, 1986, Sergeant Fraley conducted a consensual interview of Roman at his Delano office. Roman claimed he had last seen Violeta on the evening of Friday, February 21, 1986, at his insurance office. Roman admitted selling a $75,000 insurance policy to Violeta in 1985. A short time later, Violeta "started questioning" Roman about a $250,000 life insurance policy. Roman said Violeta also "attempted to change" the primary beneficiary on the $75,000 policy from her husband, Reny, to her niece, Leny. Roman further claimed he sold Violeta the $250,000 insurance policy one week before her death, and she had signed the application for it. Violeta gave Roman about $80 in cash so he could purchase a money order for the policy. Roman acknowledged sending the application to Midland National. Roman maintained Violeta wanted him to use a Richgrove post office box number as a return address. However, the application bore Roman's post office box number. Roman informed Fraley about the pending insurance claim investigation and said he did not expect any payment to be made on the $250,000 policy application.

On June 2, 1986, Roman called Lemke for an update on the claims investigation. Lemke advised the insurance company was concerned about the authenticity of Violeta Petersen's signature on the $250,000 policy application. Roman said, "Right, well, you'll [*sic*] be sending a letter on that." On June 10, 1986, Lemke wrote Roman and repeated his concern about the signature on the policy application. Roman responded with a letter on his personal stationery, stating: "As addressed in your letter of June 10, 1986, which I have enclosed a copy, I will try to explain any unanswered questions you have directed to

9.

me." According to Roman, Violeta thought the $75,000 policy had lapsed and that Leny would apply for guardianship of Chris in the event of Violeta's demise. Roman indicated Leny had orally agreed to care for Violeta's child. Roman's letter did not answer Lemke's questions about the signature on the $250,000 policy application.

On June 11, 1986, Midland National mailed Reny Petersen a check for $76,362.50, representing the proceeds from Violeta's 1985 policy plus interest. Before Reny cashed the check, defendants engaged him in a discussion about the insurance money. Both defendants initially said he could not "get anything because the paper has been lapsed." Roman told Reny he would be in trouble because Violeta's policy had lapsed. Leny told her uncle he could not keep the money and said he should return it. Leny said she would accompany him to the bank so he could return the funds.

On June 23, 1986, Reny deposited $65,962.50 of the insurance money at Presidio Savings and Loan in Delano. Reny also put some of the insurance money in his Bank of America account.

On June 25, 1986, Leny drove her uncle to the Delano branch of Bank of America, and he withdrew $9,000 in cash from his account. Reny handed over all of this money to Leny while they were still in the bank. Reny also gave Leny another $1,000 in cash he had previously retained when he first deposited the insurance check.

On July 8, 1986, Leny and Reny went to the Presidio Savings and Loan, and Reny signed a document in Leny's presence. Reny believed that document would return the insurance proceeds to Midland National. In fact, Presidio issued Reny a cashier's check in the sum of $66,000. On the same date, someone deposited $68,330.60 into an account at the main branch of Santa Barbara Savings in Bakersfield. The account was in the name of "Roman Galafate Insurance and Financial Services Center." Part of that deposit consisted of a $66,000 cashier's check issued by Presidio Savings to Reny B. Petersen. Santa Barbara Savings Supervisor Raul Holquin could not identify the person who deposited the cashier's check. However, Santa Barbara Savings' policy prohibited a third

person from making a deposit on someone else's account. On the same date, someone withdrew $61,180 from Roman Galafate's account. Midland National never received any money back from the $75,000 Petersen claim.

On July 25, 1986, Donald Lemke wrote defendants and denied the $250,000 claim. The company did not issue a policy in response to the application.

On November 13, 1986, Detective Fraley interviewed Leny at her home after advising her of her rights pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436. Roman was present during a portion of the interview. Leny claimed Violeta was going to go shopping with Leny's mother on Saturday, February 22, 1986. Three times during the course of the interview, Leny denied signing the insurance application.[6] Leny provided Fraley with four handwriting exemplars.

Detective Fraley submitted Leny's handwriting exemplars to Kern County Deputy Sheriff Cheryl Gottesman, an examiner of questioned documents. Gottesman examined Leny's exemplars, the signature on the $250,000 application, and the signatures on the credit cards issued to Violeta Petersen. Magnification of the signature on the application disclosed the letters had been carefully and individually formed, and later linked together. The style of subsequently connecting separate letters suggested a forgery.

On March 18, 1987, Deputy Gottesman reported the person who signed Violeta's name on the application was not the same person who had signed the credit cards. She further reported there was a strong similarity between the signature on the application and Leny Galafate's handwriting. However, Leny's exemplars were basically printed, and Gottesman lacked sufficient cursive writing to make a positive comparison.

**The Continued Investigation**

On September 23, 1987, Leny provided another handwriting exemplar for Deputy Gottesman's examination. In a report dated September 29, 1987, Gottesman concluded

---

[6] The court cautioned the jury it could only consider Roman's statements to Detective Fraley against Roman, and Leny's statements to Fraley against Leny.

11.

the person who completed and signed the two sets of exemplars with the name Leny P. Galafate was the same person who had signed the name Violeta Petersen on the insurance application. Gottesman explained Leny's signature was consistently raised above the signature line on the exemplars in the same fashion as the signature on the insurance application.

On January 12, 1988, Christopher Hillis, an investigator for the Kern County District Attorney's office, seized carpet samples from Roman's insurance office.[7] Hillis also noticed a large stain on the green carpeting. He returned later to cut out the stained carpet section for a urine analysis.

On February 11, 1988, Investigator Hillis delivered the carpet samples from Roman's office to Criminalist Laskowski. Laskowski determined the green carpeting in Roman's insurance office was "microscopically and chemically consistent" with the green fibers found on Violeta's body. Laskowski testified it was impossible to determine whether the green fibers came from the carpet in Roman's office because carpeting is manufactured in bulk and is widely distributed. Subsequent tests on the stained section of the carpet neither revealed nor ruled out the presence of urine.

On cross-examination, Criminalist Laskowski conceded there are several types of nylon fiber and his test did not show whether or not the fibers recovered from the body were of the same type of nylon as that contained in Roman's office carpet. Assuming the fibers were recovered from the victim's back, mouth, and hair, the criminalist concluded the victim had "total body contact" with the carpet. In other words, she either had been wrapped up in the carpet or had been laying upon it. However, there was no evidence

---

[7] In 1986, Criminalist Laskowski concluded neither the carpet in the Petersen home nor the carpet at the Sundance Inn was similar to the green fibers removed from Violeta's body. No carpet samples were taken from Roman's office until 1988. The green carpeting in Roman's office had been installed prior to February 1986.

any of the fibers were recovered from the victim's back. Laskowski also testified some of the mouth fibers could have come from the victim's clothing.

**Leny's Admissions That She Forged the Victim's Signature**

On March 9, 1988, Investigator Hillis spoke with Leny on the telephone to "give her an opportunity to clear up some inconsistencies," since she was suspected of forgery. The next day, Hillis and Assistant Chief Investigator Dwight Pendleton contacted Mrs. Galafate at her in-laws' home in Earlimart and asked her to come to the Delano Police Station for an interview. Leny requested an opportunity to contact her attorney, Heberto Sala of Bakersfield. She eventually accompanied the investigators to the police station after they allegedly threatened to put her children in a shelter.

At the station, Leny acknowledged to Investigator Hillis that she had signed Violeta Petersen's name on the insurance application four days before Violeta's death. Leny claimed Violeta asked her to sign the document because her child was "acting up." Although Roman was present at the time, his back was turned, and he did not know Leny had signed the document. Hillis testified the Kern County District Attorney charged defendants with the murder of Violeta Petersen on March 23, 1988.

**The Defense**

The defendants did not testify. Family members attested to the close relationship between defendants and the Petersens. Leny was the godmother of the Petersens' son, Chris. Defense counsel argued the jury would have to believe Leny conspired to kill a friend and family member who trusted her. Counsel claimed Violeta sought a larger policy so Leny would be able to care for Chris.

Dr. Dollinger testified the victim died sometime prior to 2:00 p.m. on February 22, 1986. Leny's sister, Sol Petersen, lived with the defendants and testified they were at home the entire day of February 22, 1986. She said they slept in until noon, took showers and ate lunch, and then stayed at the house to watch television and do housework. Leny's younger sister, Joey Petersen, testified Leny felt ill after Violeta died.

13.

Defense counsel proffered alternative theories of the case during closing argument. First, counsel suggested the green fibers on Violeta's body might have come from clothes she regularly wore to Roman's insurance office. Second, counsel suggested a robbery for $500 as a possible motive for the crime. Third, counsel also suggested some sort of sordid affair led to Violeta's death. Counsel pointed out Violeta's car was discovered at a motel, her wedding band was found at home after the murder, and she was planning an extended trip to the Philippines without her husband. Fourth, counsel pointed out it made no sense for the defendants to kill Violeta before Midland National received the policy application in Sioux Falls. Finally, counsel argued it did not make sense to kill Violeta in the insurance office because the MGM Professional Building was located near the Delano police and fire stations.

Defense counsel also introduced evidence of defendants' good and kind character. Several defense witnesses testified defendants were not violent people.

## PROCEDURAL BACKGROUND[8]

On or about May 26, 1988, an information was filed in the Superior Court of Kern County charging Roman and Leny with count 1, first degree premeditated murder (§ 187, subd. (a), § 189), with the special circumstance that the murder was intentional and carried out for financial gain (§ 190.2, subd. (a)(1)); and count 2, conspiracy to commit murder for financial gain (former § 182.1).

**Convictions and Sentence**

On January 23, 1989, after a joint jury trial, both Roman and Leny were convicted of count 1, first degree premeditated murder, with the special circumstance found true;

---

[8] The following procedural background is from the instant record in Roman's appeal, and the surviving records of defendants' joint jury trial in 1989 and this court's 1991 opinion that affirmed their convictions, augmented to Leny's appellate record and of which we have taken judicial notice without objection from the parties, as explained above. (§ 1170.95, subd. (d)(3).)

14.

and count 2, conspiracy to commit murder for financial gain, with two overt acts found true.

On March 23, 1989, the court denied the motion to strike the special circumstance and sentenced both Roman and Leny to life without the possibility of parole for count 1, first degree murder with the special circumstance, and stayed the term of 25 years to life for count 2, conspiracy to commit murder.

**Defendants' Direct Appeal**

Defendants filed a joint appeal with this court from their convictions and sentences. Roman filed a separate petition for writ of habeas corpus and alleged ineffective assistance of counsel.

On April 8, 1991, this court filed the nonpublished opinion that affirmed the convictions and sentences as to both defendants and denied Roman's writ petition. (*People v. Galafate et al.*, *supra*, F012067.) This court rejected defendants' arguments that the trial court improperly engaged in ex parte communications with jurors and should have considered juror declaration; the expert improperly testified about the fiber evidence; and the court should have instructed on attempted murder and theft as lesser included offenses. We held the prosecutor did not comment on Roman's invocation of his right to remain silent, the prior acts evidence was properly admitted, the district attorney's office did not violate Leny's right to counsel, and Leny's murder conviction was supported by substantial evidence.

We also addressed defendants' arguments about the two overt acts found true for count 2, conspiracy to commit murder: (1) Roman purchased a money order for $83 from Miracle Market in Delano; and (2) Roman and Leny obtained money from an insurance policy, the beneficiary of which was Reny Peterson, by means of false pretenses. On appeal, we agreed with defendants that the second overt act was improperly alleged and found true because it was based on defendants' acts after the murder. "[T]he object of the conspiracy charged in Count II is the substantive crime of

murder," and the second overt act, based on defrauding Reny Peterson, occurred after the murder and could not be an overt act. However, we held the error was harmless and it did not require the reversal of defendants' convictions because "only one overt act need be alleged and proved to support the conspiracy conviction, even though other overt acts not alleged may be given in evidence. [Citation.] Moreover, evidence of how defendants obtained the proceeds of the $75,000 insurance policy from Reny Peterson was clearly relevant and admissible as to the murder count as well as the conspiracy count whether or not the trial court struck overt act No. 2."

Defendants filed a petition for rehearing with this court, which was denied. Defendants also filed a petition for review with the California Supreme Court, and that was also denied.

**Roman's 2014 Confession**

Both defendants filed numerous postjudgment writ petitions challenging their convictions.

On March 2, 2015, Leny filed another writ petition in superior court and claimed Roman, who was now her ex-husband after their 2009 divorce, had confessed to the murder and completely exonerated her, Leny was factually innocent, and Roman's confession constituted newly discovered evidence of her innocence.

The petition was supported by Roman's declaration, dated December 12, 2014, that he had previously maintained his innocence, but now confessed that he murdered the victim on February 22, 1986. Roman declared that Mrs. Petersen unexpectedly appeared at his office that morning. Mrs. Petersen asked for help because she and her husband borrowed money using her parents' home as collateral, they were unable to pay the loan, and the home was about to go into foreclosure. Roman declared the victim was in a panic and asked for his help. She wanted him to cancel the large insurance policies she had purchased and refund the money so she could pay the outstanding loans. Roman said he could not give her a refund. She asked Roman for a loan, and he refused.

16.

Roman declared Mrs. Petersen became angry and began shouting at him. He told her to leave. She became "even angrier and began to strike me with her hands and fists. This angered me and I overacted without thinking. I took the sweater that she wrapped around her shoulders and choked her with it just to shut her up and stop her flailing. It was not my intention to kill her; I only wanted to muffle her shouting. But, I ended up strangling her to death. It was a spontaneous spur of the moment act. I had never previously planned to kill Leny's aunt. And it wasn't my intention to 'kill' her when I choked her with her own sweater." After he killed Mrs. Petersen, he put her body in his office's private restroom, drove her car to the motel and left it there, and walked back to his office. He put her body in his car and dumped it on the road.

Roman declared Leny did not know he was going to kill her aunt because it was a spontaneous incident, they never planned anything, Leny did not know "until now" that he killed Mrs. Petersen, and he finally confessed to clear his conscience.

On June 2, 2015, the superior court denied Leny's writ petition that was based on Roman's alleged confession, cited to this court's 1991 opinion, and found Roman's declaration unreliable and self-serving.

> "[Roman] has nothing to lose by confessing since he cannot suffer any greater punishment. Though confessing his involvement in Violeta Peterson's [*sic*] murder may clear his conscience, it does very little if anything to clear petitioner of culpability. It does not exonerate [Leny] because there is still an abundance of circumstantial evidence linking [Leny] to her aunt's murder. Where such circumstantial evidence exists, a confession by a co-defendant is not enough to sustain a claim of innocence….

> "… The circumstantial evidence establishes that petitioner and her husband conspired to commit murder and did in fact murder Violeta Peterson [*sic*] for the life insurance proceeds. Though petitioner may have played a lesser role in the actual murder, this does not absolve her of culpability. She had knowledge of her husband's acts, and did nothing about it believing that the life insurance policies would take care of their financial problems after previously filing for bankruptcy in October 1985.

"[Leny's supporting declaration] is also self-serving in that it virtually mirrors that of her ex-husband. It mentions nothing about forging of a life insurance policy and deposit of funds which did not belong to the couple in their bank account. All these above-mentioned factors along with the circumstantial evidence not only provide a motive to murder Violeta Peterson but also to link the petitioner to the murder."

## SENATE BILL NOS. 1437 & 775

The instant appeal is from the denial of Roman's petition for resentencing that he filed pursuant to Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437).

Senate Bill 1437 was effective on January 1, 2019, and amended " 'the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life.' " (*People v. Lewis* (2021) 11 Cal.5th 952, 959 (*Lewis*).)[9]

"Substantively, Senate Bill 1437 accomplishes this by amending section 188, which defines malice, and section 189, which defines the degrees of murder, and as now amended, addresses felony murder liability." (*People v. Martinez* (2019) 31 Cal.App.5th 719, 723; *People v. Gentile* (2020) 10 Cal.5th 830, 842.)

"In addition to substantively amending sections 188 and 189 of the Penal Code, Senate Bill 1437 added section 1170.95, which provides a procedure for convicted murderers who could not be convicted under the law as amended to retroactively seek relief." (*Lewis, supra*, 11 Cal.5th at p. 959.)

---

[9] As amended, section 189, subdivision (f) states an exception that allows "individuals to be convicted of felony murder even if they did not act with malice and do not fall in one of the three categories of section 189, subdivision (e), where the victim is a peace officer engaged in the course of his or her duties and the defendant knows (or reasonably should know) these facts." (*People v. Hernandez* (2021) 60 Cal.App.5th 94, 99.)

18.

"Pursuant to section 1170.95, an offender must file a petition in the sentencing court averring that: '(1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine[;] [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted for first degree or second degree murder[;] [¶] [and] (3) The petitioner could not be convicted of first or second degree murder because of changes to section 188 or 189 made effective January 1, 2019.' [Citations.] Additionally, the petition shall state '[w]hether the petitioner requests the appointment of counsel.' [Citation.] If a petition fails to comply with subdivision (b)(1), 'the court may deny the petition without prejudice to the filing of another petition.' " (*Lewis, supra*, 11 Cal.5th at pp. 959–960.)

"Where the petition complies with [section 1170.95,] subdivision (b)'s three requirements, then the court proceeds to subdivision (c) to assess whether the petitioner has made 'a prima facie showing' for relief. [Citation.] [¶] If the trial court determines that a prima facie showing for relief has been made, the trial court issues an order to show cause, and then must hold a hearing 'to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not … previously been sentenced, provided that the new sentence, if any, is not greater than the initial sentence.' [Citation.] 'The prosecutor and the petitioner may rely on the record of conviction or offer new or additional evidence to meet their respective burdens.' [Citation.] At the hearing stage, 'the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing.' " (*Lewis, supra*, 11 Cal.5th at p. 960.)

**Lewis**

In *Lewis*, the court interpreted the provisions of section 1170.95 and held that petitioners "are entitled to the appointment of counsel upon the filing of a facially

19.

sufficient petition [citation] and that only *after* the appointment of counsel and the opportunity for briefing may the superior court consider the record of conviction to determine whether 'the petitioner makes a prima facie showing that he or she is entitled to relief.' " (*Lewis, supra*, 11 Cal.5th at p. 957, italics added in original.)  " 'If the petitioner has requested counsel, the court *shall* appoint counsel to represent the petitioner.' "  (*Id*. at p. 963, italics added in original.)

*Lewis* also held that "at the prima facie stage, a petitioner's allegations should be accepted as true, and the court should not make credibility determinations or engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*Lewis, supra,* 11 Cal.5th at p. 974.)  When the court conducts the prima facie determination, section 1170.95, subdivision (b)(2) only permits screening out "noncomplying petitions, not petitions that lack substantive merit." (*Lewis,* at p. 968.)

*Lewis* further held that after appointing counsel, the trial court may rely on the record of conviction to determine whether the prima facie showing has been made in order "to distinguish petitions with potential merit from those that are clearly meritless." (*Lewis, supra*, 11 Cal.5th at pp. 970–971.)  "While the trial court may look at the record of conviction after the appointment of counsel to determine whether a petitioner has made a prima facie case for section 1170.95 relief, the prima facie inquiry under subdivision (c) is limited.  Like the analogous prima facie inquiry in habeas corpus proceedings, ' "the court takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved.  If so, the court must issue an order to show cause." ' " (*Lewis,* at p. 971.)

" 'However, if the record, *including the court's own documents*, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' " (*Lewis, supra*, 11 Cal.5th at p. 971, italics added.)

20.

"Appellate opinions … are generally considered to be part of the record of conviction. [Citation.] However, as we cautioned in [*People v. Woodell* (1998) 17 Cal.4th 448, 457], the probative value of an appellate opinion is case specific, and 'it is certainly correct that an appellate opinion might not supply all answers.' [Citation.] In reviewing any part of the record of conviction at this preliminary juncture, a trial court should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' [Citation.] As the People emphasize, the 'prima facie bar was intentionally and correctly set very low.' " (*Lewis, supra*, 11 Cal.5th at p. 972.)

"[T]here is no categorical bar to consulting the record of conviction at the prima facie stage." (*Lewis, supra*, 11 Cal.5th at p. 972, fn. 6.) "In sum, the parties can, and should, use the record of conviction to aid the trial court in reliably assessing whether a petitioner has made a prima facie case for relief under [section 1170.95,] subdivision (c)." (*Id.* at p. 972.)

The prima facie determination is a question of law, and the court may deny a petition at the prima facie stage if the petitioner is ineligible for resentencing as a matter of law. (*Lewis, supra*, 11 Cal.5th at p. 966.)

*Lewis* announced a prejudicial error standard under *People v. Watson* (1956) 46 Cal.2d 818, if the court failed to appoint counsel or violated the petitioner's statutory rights under section 1170.95, and the petitioner must "therefore 'demonstrate there is a reasonable probability that in the absence of the error he [or she] … would have obtained a more favorable result.' " (*Lewis, supra*, 11 Cal.5th at p. 974.)

Therefore, to demonstrate prejudice from the denial of a section 1170.95 petition before the issuance of an order to show cause, the petitioner must show it is reasonably probable that, absent error, his or her petition would not have been summarily denied without an evidentiary hearing. (*Lewis, supra*, 11 Cal.5th at pp. 972–974; see *People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

**Senate Bill No. 775**

In October 2021, Senate Bill No. 775 was enacted and amended section 1170.95, effective on January 1, 2022 (2020–2021 Reg. Sess.) (Stats. 2021, ch. 551, § 1) (Senate Bill 775). As a result of the amendments, section 1170.95 clarified that "persons convicted of felony murder or murder under the natural and probable consequences doctrine or other theory under which malice is imputed to a person based solely on that person's participation in a crime, attempted murder under the natural and probable consequences doctrine, or manslaughter," may file a petition to have that conviction vacated under certain circumstances. (§ 1170.95, subd. (a).)

The amendments also codified the holding in *Lewis* that "[u]pon receiving a petition in which the information required by this subdivision is set forth …, if the petitioner has requested counsel, the court shall appoint counsel to represent the petitioner." (§ 1170.95, subd. (b)(3).) After the petition is filed, the People shall file a response and the petitioner may serve a reply. (*Id*. at subd. (c).)

After the parties have the opportunity to submit briefs, "the court shall hold a hearing to determine whether the petitioner has made a prima facie case for relief." (§ 1170.95, subd. (c).) If the petitioner makes the prima facie showing, "the court shall issue an order to show cause." (*Ibid*.) If the court declines to issue an order to show cause, "it shall provide a statement fully setting forth its reasons for doing so." (*Ibid*.)

If an order to show cause is issued, "the court shall hold a hearing to determine" whether to vacate the petitioner's conviction, recall the sentence, and resentence petitioner. (§ 1170.95, subd. (d)(1).) At the hearing, the prosecution has the burden to prove beyond a reasonable doubt that petitioner is guilty of murder or attempted murder under the amended versions of sections 188 and 189. (§ 1170.95, subd. (d)(3).)

"At the hearing to determine whether the petitioner is entitled to relief … [t]he admission of evidence in the hearing shall be governed by the Evidence Code, except that the court *may consider evidence previously admitted at any prior hearing or trial that is*

22.

*admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion.* However, hearsay evidence that was admitted in a preliminary hearing pursuant to subdivision (b) of Section 872 shall be excluded from the hearing as hearsay, unless the evidence is admissible pursuant to another exception to the hearsay rule. The prosecutor and the petitioner may also offer new or additional evidence to meet their respective burdens. A finding that there is substantial evidence to support a conviction for murder … is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (§ 1170.95, subd. (d)(3), as amended by Stats. 2021, ch. 551, § 2, eff. Jan. 1, 2022, italics added.)

## ROMAN'S SECTION 1170.95 PETITION

On March 1, 2019, Roman filed a section 1170.95 petition for resentencing on his conviction for first degree murder with the special circumstance and requested appointment of counsel.

The petition was supported by Roman's declaration, signed under penalty of perjury, where he checked boxes on a preprinted form that he was entitled to resentencing under section 1170.95 because a complaint or information was filed against him that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine; at trial, he was convicted of first or second degree pursuant to the felony-murder rule or the natural and probable consequences doctrine; and he could not now be convicted of first or second degree murder under the amended versions to sections 188 and 189 because he was not the actual killer and the prosecutor conceded he was unable to identify the actual killer; he did not, with the intent to kill, aid, abet, counsel, command, induce, solicit, request, or assist the actual killer in the commission of first degree murder; and he was not a major participant and did not act with reckless indifference.

On March 8, 2019, the trial court appointed counsel for Roman.

**The People's Opposition**

On May 2, 2019, the People filed opposition, and included a factual statement that appears consistent with the 1989 probation report and the factual statement from this court's 1991 opinion.

The People argued Roman was not eligible for relief under section 1170.95 because he was convicted of first degree murder with the special circumstance "under a straight-up aiding and abetting theory based on a conspiracy to murder Victim for financial gain." There were no underlying felonies alleged, he was not convicted under the felony-murder rule or the natural and probable consequences doctrine, and the jury found true the special circumstance, that he had the intent to kill the victim for financial gain.[10]

Roman's conviction "was based solely only on the conspiracy to commit murder, his overt acts in furtherance of the conspiracy and the actual murder of Victim for the purpose of financial gain, i.e., not based on participation in an underlying offense. Aiding and abetting was the theory upon which the prosecution presented its case. No other charges were pled or proved at trial …."

**Roman's Reply**

On May 13, 2020, Roman's counsel filed a reply to the People's opposition that stated: "[Roman] submits on the … section 1170.95 Petition filed in this case on March 1, 2019, wherein he denied being the killer and denied he acted with reckless indifference to human life. The statements to the contrary contained in the People's opposition are speculative and not based on the record. The Petitioner was tried on a theory of aiding and abetting a murder not on the theory that he was the actual killer."

---

[10] On April 25, 2019, the People filed a motion to dismiss Roman's petition because the amendments enacted by Senate Bill 1437 was unconstitutional. On May 2, 2019, Roman filed opposition. On March 11, 2020, the court denied the People's motion to dismiss.

24.

**The Court's Denial of Roman's Petition**

On August 10, 2020, the court filed a minute order that stated it had received and considered the parties' pleadings, and summarily denied Roman's petition without holding a hearing.

On August 12, 2020, Roman timely filed a notice of appeal.

## DISCUSSION

As noted above, Roman's counsel has filed a *Wende* brief with this court. The brief also includes the declaration of appellate counsel indicating that Roman was advised he could file his own brief with this court. By letter on November 18, 2020, we invited him to submit additional briefing. He did not do so.

**Section 1170.95**

Roman's petition was filed and denied before *Lewis* was decided and section 1170.95 was amended by Senate Bill 775. However, the statutory amendments are applicable to this case since it is not yet final on appeal. (See, e.g., *People v. Porter* (2022) 73 Cal.App.5th 644, 652; *People v. Vieira* (2005) 35 Cal.4th 264, 306; *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 306–309.) In any event, the superior court complied with the amendments to section 1170.95, subdivisions (b) and (c) by appointing counsel and having the parties brief the issue at the prima facie stage. The court, however, did not conduct a hearing or issue a statement of reasons why it decided not to issue an order to show cause as required by section 1170.95, subdivision (c). It is also not clear whether the court improperly denied the petition by engaging in premature factfinding based on the factual statement in the People's opposition, which appears to be either from the 1989 probation report or this court's 1991 opinion. (*Lewis, supra*, 11 Cal.5th at pp. 971–972; § 1170.95, subd. (c).)

The opinion in defendants' direct appeal is part of the record of conviction that the court may consider in determining whether petitioner has made a prima facie showing of resentencing eligibility. (*Lewis, supra*, 11 Cal.5th at p. 972.) However, the role of the

25.

appellate opinion is circumscribed. The factual summary contained in an appellate opinion is not considered admissible evidence regarding a petitioner's resentencing eligibility (§ 1170.95, subd. (d)(3)), and the court may not engage in factfinding based on the appellate opinion at the prima facie stage (*Lewis,* at p. 972).

The trial court erroneously denied Roman's section 1170.95 petition without holding a hearing, issuing a statement of reasons when it declined to issue an order to show cause, and possibly engaging in premature factfinding at the prima facie stage. (§ 1170.95, subd. (c).) However, we may affirm the denial of the petition if petitioner was not prejudiced by the statutory errors in this case. (*Lewis, supra*, 11 Cal.5th at pp. 972–974.)

To demonstrate prejudice from the denial of a section 1170.95 petition before the issuance of an order to show cause, the petitioner must show it is reasonably probable that, absent the statutory error, his petition would not have been summarily denied without an evidentiary hearing. (*Lewis, supra*, 11 Cal.5th at pp. 972–974; *People v. Watson, supra,* 46 Cal.2d at p. 836.) The prima facie determination is a question of law, and the court may deny a petition at the prima facie stage if the petitioner is ineligible for resentencing as a matter of law. (*Lewis,* at p. 966.)

**The Special Circumstance**

The information charged both defendants with count 1, first degree premeditated murder (§ 187, subd. (a), § 189), with the special circumstance that the murder was "intentional and carried out for financial gain," within the meaning of section 190.2, subdivision (a)(1).

The court instructed the jury on first and second degree murder, premeditation, and express and implied malice, and the special circumstance. The jury was not instructed on any underlying felonies, or target or nontarget offenses, aside from murder and the lesser offense of manslaughter.

26.

The court instructed the jury with CALJIC No. 8.80 (1984 revision) on the special circumstance of murder for financial gain:

> "If you find the defendant[s] in this case guilty of murder in the first degree, you must then determine if murder was committed under the following special circumstance:  the murder was intentional and carried out for financial gain.

> "A special circumstance must be proved beyond a reasonable doubt.

> "If you have a reasonable doubt as to whether a special circumstance is true, it is your duty to find it is not true.

> "If defendants, or either of them, was an aider and abettor *but not the actual killer*, it must be proved beyond a reasonable doubt that *he intended to aid in the killing of a human being* before you are permitted to find the alleged special circumstance of that first degree murder to be true as to that defendant.

> "You must decide separately as to each of the defendants as to the existence or nonexistence of the special circumstance charged in this case. If you cannot agree upon your finding as to both defendants but can agree as to one of them, you must make your finding as to the one upon which you do agree…."

The jury also received CALJIC No. 8.81.1:

> "To find that the special circumstance, referred to in these instructions as murder for financial gain, is true, each of the following facts must be proved:

> "1.  *That the murder was intentional*, and

> "2.  That it was carried out for financial gain."  (Italics added.)

"Under section 190.2, subdivision (a)(1), a defendant is subject to the special circumstance if the 'murder was intentional and carried out for financial gain.'  Even if the defendant is 'not the actual killer,' if that defendant 'with the intent to kill, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree,' he or she is also subject to this special circumstance. (§ 190.2, subd. (c).)  'Reading the two provisions together it is clear that one who

27.

intentionally aids or encourages a person in the deliberate killing of another for the killer's own financial gain is subject to the special circumstance punishment.' (*People v. Freeman* [1987] 193 Cal.App.3d [337,] 339 [construing 1978 version of § 190.2]; see *People v. Padilla* (1995) 11 Cal.4th 891, 933.)" (*People v. Fayed* (2020) 9 Cal.5th 147, 201–202.)

Pursuant to section 1170.95, a petitioner is ineligible for resentencing if he or she was the actual killer, acted with the intent to kill or malice aforethought, or was a major participant in the underlying felony who acted with reckless indifference to human life. (§§ 188, subd. (a)(3), 189, subd. (e), 1170.95, subd. (a)(3); see *People v. Gentile, supra*, 10 Cal.5th at p. 842.) The financial gain special circumstance required the jury to find either that Roman was the actual killer, or he intentionally aided and abetted the actual killer in the commission of the murder. (*People v. Fayed, supra*, 9 Cal.5th at pp. 201–202; *People v. Allison* (2020) 55 Cal.App.5th 449, 460; § 190.2, subds. (a)(1), former subd. (b).)

The true finding on the special circumstance therefore establishes the jury made the findings necessary to show an intent to kill for Roman's conviction of first degree premeditated murder under the law as amended by Senate Bill 1437. Roman is thus ineligible for resentencing as a matter of law, and he was not prejudiced by the court's summary denial of her petition. (*Lewis, supra*, 11 Cal.5th at pp. 972–974.)

**The Conspiracy Instructions**

We also find the jury was correctly instructed on conspiracy to commit murder, as charged in count 2. In CALJIC No. 6.23, the jury was instructed that defendants were charged with conspiracy to commit "first degree murder with the special circumstance of being an intentional murder for financial gain." The court gave CALJIC No. 6.10 (1974 revision), that a conspiracy "is an agreement entered into between two or more persons with the specific intent to agree to commit the public offense of *murder in the 1st degree*

28.

*with the special circumstance of being an intentional murder for financial gain, and with the further specific intent to commit such offense….*" (Italics added.)

The jury also received CALJIC No. 6.11:

> "Each member of a criminal conspiracy is liable for each act and bound by each declaration of every other member of the conspiracy if said act or said declaration is in furtherance of the object of the conspiracy.

> "The act of one conspirator pursuant to or in furtherance of the common design of conspiracy is the act of all conspirators. *Every conspirator is legally responsible for an act of a coconspirator that follows as one of the probable and natural consequences of the object of the conspiracy even though it was not intended as a part of the original plan and even though he was not present at the time of the commission of such act.*" (Italics added.)

The court gave CALJIC No. 6.22, that the jury had to determine as to each defendant whether that person was a member of the alleged conspiracy and whether that person willfully, intentionally, and knowingly joined with any other or others in the alleged conspiracy.

While these instructions may have left open the possibility for defendants to be convicted under a "natural consequences" theory subsequently eliminated by Senate Bill 1437, the record establishes the jury did not find Roman guilty of first degree premeditated murder under an imputed malice theory. "Under the natural and probable consequences theory of aiding and abetting a murder, a defendant can be found guilty of murder if he or she aids and abets a crime (i.e., the target crime) and murder (i.e., the nontarget crime) is a natural and probable consequence of that target crime." (*People v. Chavez* (2018) 22 Cal.App.5th 663, 683.)

Under the conspiracy instructions in this case, however, *the target offense* was first degree murder because defendants were charged and convicted of *conspiracy to commit first degree murder*. "[A] conviction of conspiracy to commit murder requires a finding of intent to kill[.]" (*People v. Swain* (1996) 12 Cal.4th 593, 607.) " '[A]ll conspiracy to

29.

commit murder is necessarily conspiracy to commit premeditated and deliberated first degree murder.' " (*People v. Beck and Cruz* (2019) 8 Cal.5th 548, 641.)  Even under the language in CALJIC No. 611, the jury was instructed to consider *murder* as a natural and probable consequence of a conspiracy to commit *murder*.  Moreover, as explained above, based on the special circumstance instructions and finding, it is clear the jury convicted Roman of first degree premeditated murder by finding he had the intent to kill.

We thus conclude Roman is ineligible for resentencing as a matter of law, and he was not prejudiced by the court's summary denial of his petition.  (*Lewis, supra*, 11 Cal.5th at pp. 972–974.)

After independent review of the record, we find that no reasonably arguable factual or legal issues exist.

## DISPOSITION

The judgment is affirmed.